633 So.2d 79 (1994)
SOUTH LAKE WORTH INLET DISTRICT, Appellant,
v.
TOWN OF OCEAN RIDGE; Inlet Plaza Condominium, Inc.; McCormick Mile Beach Club, Inc.; and State of Florida Department of Natural Resources, Appellees.
TOWN OF MANALAPAN; Thomas J. Kelly; Dirk Brady as Trustee; Peter Blum and Maureen Blum, his wife; and L.C. Paslay and Aileen H. Paslay, Appellants,
v.
TOWN OF OCEAN RIDGE; Inlet Plaza Condominium, Inc.; McCormick Mile Beach Club, Inc.; and State of Florida Department of Natural Resources, Appellees.
PALM BEACH COUNTY, Appellant,
v.
TOWN OF OCEAN RIDGE; Inlet Plaza Condominium, Inc.; McCormick Mile Beach Club, Inc.; and State of Florida Department of Natural Resources, Appellees.
Nos. 90-3253, 90-3261 and 90-3265.
District Court of Appeal of Florida, Fourth District.
February 23, 1994.
Clarification/Modification Denied March 18, 1994.
*80 John Beranek of Aurell, Radey, Hinkle, & Thomas, Tallahassee, and James McC. Wearn of James McCartney Wearn, P.A., West Palm Beach, for South Lake Worth Inlet Dist.
Jane Kreusler-Walsh and Randy D. Ellsion of Jane Kreusler-Walsh, P.A., H. Laurence Cooper, Jr., of Brackett, Cook, Sned, Welch, Hewitt, D'Angio & Tucker, and John C. Randolph of Jones, Foster, Johnston & Stubbs, P.A., West Palm Beach, for Town of Manalapan, Thomas J. Kelly, Dirk Brady, Peter Blum, Maureen Blum, L.C. Paslay and Aileen H. Paslay.
*81 Christopher D. Mauriello, Sharron M. Pitts and Jacqueline S. Miller, Asst. County Attys., West Palm Beach, for Palm Beach County.
David P. Ackerman, Scott J. Link and Roy E. Fitzgerald of Gunster, Yoakley & Stewart, P.A., and Paul J. Nicoletti and Phyllis S. Block of Paul J. Nicoletti, P.A., West Palm Beach, for Town of Ocean Ridge, Inlet Plaza Condominium Inc., and McCormick Mile Beach Club Inc.
Kenneth J. Plante, Gen. Counsel, and Eugene E. McClellan, Jr., Deputy Gen. Counsel, Tallahassee, for State of Florida Dept. of Natural Resources.
Clifton A. McClelland of Potter, McClelland, Marks & Healy, P.A., Melbourne, for amicus curiae Sebastian Inlet Tax Dist.
FARMER, Judge.
We have at hand three separate appeals from the same judgment, all of which emanate from the same trial before the same circuit judge. Because his judgment as to each appellant is founded wholly on the same core of operative facts, we consolidate these appeals and decide them together. Moreover, as our opinion will make clear, there is a single legal error which we conclude requires a reversal as to all parties.
The subject of the case is sand. Or, more precisely, it is the erosion of sand from the beaches around the Boynton Inlet.[1] The Town of Ocean Ridge [Ocean Ridge], a small coastal municipality just south of the Inlet, complained essentially that institutional decisions have resulted in undue erosion of its beaches. It alleged that the design and operation of a sand transfer plant at the Inlet have caused its beaches to lose more sand than nature would have otherwise contrived. Initially, Ocean Ridge sued the South Lake Worth Inlet District [District] and Palm Beach County [County]. District operates the sand transfer plant at the Inlet under an agreement with County.
Later, Ocean Ridge added the State Department of Natural Resources [DNR], the administrative agency that had given a permit to the District to operate a sand transfer plant at the Inlet, and sought to enjoin DNR to order District and County to effect the cure. The Town of Manalapan [Manalapan], a small coastal municipality just north of the Inlet concerned that any cure might adversely affect its own beaches, was allowed to intervene. Eventually, the court also permitted several nearby residents to join the litigation as intervenors on one side or the other.
In the final judgment we review today, the court denied the petition by Ocean Ridge and the others, as interested persons, to compel or enforce agency action under section 120.69(1)(b). On the other hand, however, the court agreed with Ocean Ridge and its allies that its beaches were not receiving contemplated protection from the effects of erosion resulting from the presence of the Inlet. The court fashioned a comprehensive order for relief, including restoration of the beaches, modifications to a sand transfer plant operating at the Inlet, changes in one of the jetties, and monitoring of the maintenance of area beaches.
District, County and Manalapan appeal these rulings. District argues that DNR has primary jurisdiction over this dispute, such that the court's assertion of jurisdiction violates the separation of powers doctrine; that the court improperly applied the 1987 amendment to section 161.142; that the operation of the state regulated and permitted sand transfer facility cannot possibly be a nuisance as a matter of law; and that the relief imposed is impossible to perform. County argues that it owed no duty to any plaintiff that could be a subject of injunctive relief, and that the court's decision is an impermissible entanglement with an executive branch discretionary function. Manalapan appeals the court's denial of relief on the claim filed by the Town and several of its citizens contending that the operation of the sand transfer plant by the District and County had taken an undue amount of sand from its shores. It joins in all of the issues raised *82 by District and County, and adds for itself that the evidence was insufficient to show that the downdrift shoreline has been changed, and that the claims are barred by the statute of limitations or laches. Ocean Ridge crossappeals the court's finding that no permit violation occurred.
Having sifted through the issues and argument, we find one contention that proves in our judgment to be dispositive. It concerns the companion concepts of primary jurisdiction and exhaustion of administrative remedies, which are in turn bound up with constitutional limitations on the separation of powers. To be sure, appellate application in this case of these well recognized concepts is clouded by the course of events below, the most disturbing of which is the position taken by the very agency whose primary jurisdiction was willingly avoided.
In 1915 Lake Worth was a landlocked, fresh water lake polluted by the regular deposit of waste from adjoining communities established along its shores. It was thus to address the problem of this pollution that the legislature in that year created the District. It was empowered "to construct and thereafter to maintain an inlet or waterway connecting the waters of Lake Worth with the Atlantic Ocean, at a convenient and proper place." Ch. 7080, § 5, Laws of Fla. (1915).[2]
On the eastern coast (Atlantic) of Florida, sand drifts along the shoreline in alternating directions. Averaged over a typical year, however, there is a net littoral drift southward. That is to say, although the direction of the drift of sand shifts from north to south with the changing of the winds and seasons, the southward drift predominates. The north edge of the Inlet was thus constructed to extend a jetty into the ocean for a distance much greater than the south jetty.
Hence, the north jetty interrupts this natural littoral southward drift, the effect of which is to cause sand to build up along the length of the north jetty. Correspondingly it tends also to accelerate the process of erosion on the beaches to the immediate south. For that reason, the sand transfer plant at the north jetty is designed to pump the sand accumulated there, which could otherwise eventually clog the Inlet, to the beaches southward of the south jetty.
Nearly a half century after the District was created, the Florida legislature first addressed the subject of beach preservation in general legislation, which it entitled "the shore and beach preservation act." See Ch. 61-246, Laws of Fla. In the approach used in the 1961 act, the legislature required the adoption of purely local plans for comprehensive shore and beach preservation and, understandably, it placed the burden of statutory enforcement on the counties. This attempt at local control of Florida's sandy beaches lasted for just four years, however. In 1965 the legislature entirely jettisoned the concept and replaced it with a new statutory scheme of state jurisdiction. See Ch. 65-408, Laws of Fla.
Under the 1965 legislation, any city or county or special district desiring to carry on any "work or activity which is likely to have a material physical effect on existing coastal conditions or natural shore processes" was required to obtain a permit from the state. § 161.021(4), Fla. Stat. (1965). This legislation did not attempt to define or require what or how much sand was necessary or desirable as to Florida's beaches. Nor did it attempt to specify any entitlement of any citizen or groups of citizens with regard to beach erosion.
Rather, the act required the removal of any coastal construction, jetty or other structure *83  "regardless of the date of construction or whether a permit has been issued in accordance with this chapter"  if the appropriate state agency[3] determined it to be "unnecessary or undesirable." § 161.061, Fla. Stat. (1965). In short, the central idea of this abandonment of local control was to empower a single state agency to study any problem beach and then decide on any cure or modification. Although counties were allowed to adopt their own local schemes to deal with beach erosion, programs so adopted were entirely voluntary and in any event subject to the state's plenary control. See Ch. 65-408, § 161.24, Laws of Fla.
In response to this statutory revision, in that same year District sought and received a permit from DNR's predecessor as part of an effort to improve the Boynton Inlet's design and function.[4] The permit allowed the District to extend the Inlet's north and south jetties and to enlarge and relocate the sand transfer plant. Significantly, under this permit District agreed that it would "adjust, alter or remove" any structure, work or activity if in the opinion of the state agency the structure or work or activity "results in damage to surrounding property or otherwise proves to be undesirable." [e.s.] Correspondingly, District expressly agreed to remove any structure or work or activity upon written notice from the state agency if District failed to live up to any permit conditions. The issuance of this 1965 permit was also contingent on operating the new sand transfer plant, if practicable, in accordance with certain recommendations contained in a report issued by the University of Florida.
Five years later, in 1970,[5] the legislature established a publicly financed beach restoration program, recognizing specifically that "proper nourishment and restoration of badly eroded beaches requires the financial support of both the State and Federal governments." Ch. 70-276, Laws of Fla. (preamble). In particular it adopted what became section 161.141(1), which included the following statement of general intent:
"Declaration of public policy.  Beach erosion being a serious menace to the economy and general welfare of the people of this State and having advanced to emergency proportions, it is hereby declared to be in the public interest that the Legislature of the State of Florida make provision for publicly financed beach nourishment and restoration programs and establish and clarify the property rights of the State and private upland owners arising from or created by such programs."
The scheme adopted in what became designated as sections 161.141 to 161.211 then proceeded to set the ground rules for state funding of local beach nourishment and restoration projects. It also defined the process for deciding claims of title to uplands created by nourishment and restoration projects undertaken pursuant to the statute.
After some technical changes to chapter 161 over the period between 1970 and 1985, the legislature added significant new features to the statutory scheme in 1986. The impetus for the additions was a report submitted by DNR in April 1986. We first note a pertinent change in the deletion of the statement of general intent from section 161.141(1) quoted above. With that deletion, however, the legislature newly created section 161.142, in which it made a new declaration of general intent to guide agency decision making:
"The Legislature hereby recognizes the need for maintaining navigation inlets to promote commercial and recreational uses of our coastal waters and their resources. *84 The Legislature further recognizes that inlets alter the natural drift of beach-quality sand resources, which often results in these sand resources being deposited around shallow outer-bar areas instead of providing natural nourishment to the downdrift beaches."
Ch. 86-138, § 8, at 421-22, Laws of Fla.; § 161.142, Fla. Stat. (Supp. 1986). It established a policy relating to erosion caused by the operation of navigation inlets on downdrift beaches:
"On an average annual basis, a quantity of sand should be placed on downdrift beaches equal to the natural net annual longshore sediment transport. This sand shall be placed at no cost to the state. The placement location and quantities based on natural net annual longshore transport shall be established by [DNR], and the sand quality must be acceptable to [DNR]." [e.s.]
Ch. 86-138, § 8, at 422, Laws of Fla.; § 161.142(2), Fla. Stat. (Supp. 1986). We note that the legislature required DNR, and not the courts, to decide where and how much sand should be placed at any beach.
Exactly one year after its adoption, however, the legislature deleted this sand placement location and quantities provision [the PLQ provision] from section 161.142(2). Ch. 87-97, § 19, Laws of Fla. At the same time, the 1987 legislation also added a new provision to section 161.041(1) which provides:
"Except for deepwater ports * * *, [DNR] shall not issue any permit for the construction of a coastal inlet jetty or the excavation or maintenance of such an inlet if the activity authorized by the permit will have a significant adverse impact on the sandy beaches of this state without a mitigation program approved by [DNR]. In evaluating the mitigation program, [DNR] shall take into consideration the benefits of the long-term sand management plan of the permittee and the overall public benefits of the inlet activity." [e.s.]
Ch. 87-97, § 12, at 456-57, Laws of Fla. This new provision was an adjunct to section 161.042, which already empowered DNR to require anyone responsible for the excavation of sandy sediment for navigation purposes in any coastal beach inlet to use such sediment "for beach nourishment as prescribed by [DNR]." That provision was unchanged by the 1987 act.
Ocean Ridge brought suit in March 1987. Although initially it sued only District and County, it amended its pleadings to bring DNR and TIIF into the fray. Count I was an agency enforcement action[6] on behalf of DNR against District and County, alleging that they had violated the 1965 permit and section 161.142, Florida Statutes (Supp. 1986). Count II sought to compel DNR and TIIF to enforce against the District and County the terms of the permit the state had issued them in 1965 and to enforce generally the provisions of the state's constitution and laws concerning beach and shore preservation. Count III sought injunctive relief against the District and County to prevent them from further eroding the Ocean Ridge coastline; Count IV sought similar relief, now described as an action to abate a public nuisance in equity. Count V alleged that the citizens of Ocean Ridge had gained through custom and usage the right to a dry beach and again sought equitable relief to prevent its erosion.
Trial began on the fourth amended complaint in October 1989. The trial recessed on the fifth day of what later proved to be a 36 day trial with the judge announcing that he would send out an order setting a resumption date and Ocean Ridge filing a notice dropping DNR as a party. The notice recited as follows:
"1. In March of 1987 Ocean Ridge filed the above styled cause against [DNR], among other Defendants. [DNR] was named as a Defendant only in Count II of the Complaint. In Count II of Ocean Ridge's Fourth Amended Complaint, Ocean Ridge alleged that [DNR] failed to enforce provisions of the Florida Constitution, statutes, rules and regulations of this State.
"2. In its answer and responses to requests for admissions, [DNR] has admitted that the Boynton Inlet and its jettys [sic] *85 caused and continue to cause downdrift erosion in Ocean Ridge and that [District] and the County are operating the inlet and its structures, in violation of [the 1965 permit]. [DNR] concurs with Ocean Ridge's position in this case and supports its request for relief against [District] and the County. Furthermore, [DNR] opposes the relief sought by [the nearby residents], including the request to close down the sand transfer facility at the Boynton Inlet.
"3. On January 11, 1988, [DNR] issued its Amended Order which, in general, directed the [District] to restore the beaches immediately south of the inlet and to increase the bypassing or placement of sand south of the inlet to maintain an equilibrium north and south of the inlet. [District] challenged the Amended Order by the initiation of an administrative proceeding (the "Administrative Proceeding"), in which Manalapan, the [nearby residents], the County and Ocean Ridge intervened. The Administrative Proceeding is currently pending and bears DOAH case [number] 89-0909. The instant case involves more causes of action and broader and more comprehensive issues of law and fact than those involved in the Administrative Proceeding, the resolution of which may render unnecessary some or all of the Administrative Proceeding.
"4. The [District] has moved to stay the Administrative Proceeding pending the outcome of this case and no party was opposed. The administrative hearing officer granted that motion and stayed the Administrative Proceeding, pending the outcome of this litigation.
"5. The interests of judicial economy are better served by Ocean Ridge's proceeding in the litigation at this time and the parties holding the Administrative Proceeding in abeyance, pending the outcome of the litigation.
"6. [DNR] agrees that the prosecution of the Administrative Proceeding (bearing DOAH case no. 88-0909) should be held in abeyance, in accordance with the agreement of the parties and the order of the hearing officer, pending the outcome of this litigation. If the Final Judgment against remaining Defendants in the litigation does not include the adjustment, modifications and alterations directed by [DNR] in its Amended Order of January 11, 1988, then [DNR] will pursue in good faith the vigorous enforcement of the Amended Order in the Administrative Proceedings thereafter."
The parties went on to recite that DNR's Division of Beaches and Shores would recommend to the Governor and Cabinet that the Division pursue funding under section 161.161 for restoration and maintenance in Ocean Ridge, but that the legislature could not be bound by their own agreement. They also recited that what they had agreed was "unique" but added that "there is no adequate remedy at law." The document was executed only by DNR and Ocean Ridge.
Three weeks after Ocean Ridge and DNR filed this notice of dropping parties, District, County, Manalapan and several intervenors filed a motion seeking an order that DNR be added  in effect, returned  to the action as a formal party and aligned in accordance with its interest in the litigation. On the day that trial was resumed (March 1990), the court entered an order denying the motion without explanation. The trial then proceeded, recessing and resuming several more times over the following months. DNR took no further part in the trial as a formal party after it entered into the agreement with Ocean Ridge and was dropped.
After trial was concluded, the court made extensive findings of fact and determinations of law, including also a set of guidelines for carrying out its orders for relief. It ruled in favor of defendants on Count I, finding that District and County had performed their obligations under the terms of the permit without violation. The court granted relief, however, on Counts III through V, finding in effect that the terms of the permit did not provide Ocean Ridge with sufficient protection from downdrift erosion caused by the Inlet.[7] The relief granted has four separate *86 components: (1) a restoration program, requiring placement of at least 1.5 million cubic yards of sand on the beach at Ocean Ridge; (2) enhancement of the District's sand transfer plant, which must be completed within two years of the date of the judgment; (3) an extension of the south jetty; and (4) a long term monitoring program to govern future shoreline maintenance.
We begin our analysis by noting that, in a response to the amended complaint, District expressly raised the primacy of the agency and the adequacy of unused administrative remedies. These contentions were rejected by the trial court by a simple denial of the motion. When the fourth amended complaint was allowed, County moved for dismissal, explicitly arguing that the state agency had "Primary Administrative Jurisdiction," and pointing out that this is not "simply a matter of discretion in the sense that a trial judge may invoke or not as he thinks propitious." See State ex rel. Shevin v. Tampa Electric Co., 291 So.2d 45, 46 (Fla. 2d DCA), cert. denied, 297 So.2d 571 (Fla. 1974). Its motion was also turned aside without explanation.
In short, there can be no serious contention that the question of administrative jurisdiction and remedies was not timely raised below and a ruling had. Nevertheless while recognizing that the issue was clearly raised below, Ocean Ridge still argues that District and County have waived the issue for appellate review. It contends that, by later agreeing to stay the agency proceedings while the lawsuit was tried and adjudicated, the defendants effectively gave up their right to a review of the question. We cannot agree.
It was virtually the first determination made in the lawsuit by the trial judge, not to defer to administrative proceedings. Interlocutory rulings of trial judges on the question of whether an administrative agency has primary jurisdiction over a dispute are not among the classes of orders that are immediately reviewable under Florida Rule of Appellate Procedure 9.130(a)(3). In effect, the parties were governed by the order until the final disposition of the case when plenary review could be had.
The mere fact that the parties sought to minimize the consequences of the trial judge's decision during the progress of the case could not be fairly considered an intentional abandonment of the known right to seek final review of the earlier decision at the end of the case. The fact that District, County and Manalapan did not oppose the stay of the administrative proceedings after the trial judge had refused to defer to them should properly be understood as reflecting merely their unwillingness to be forced to proceed on both fronts, judicial and administrative, at the same time. The trial judge having unequivocally decided that the judicial front would go forward, these defendants could reasonably acquiesce in the administrative stay as a matter of simple economy without prejudicing their right to challenge on appeal the correctness of the judge's decision.[8] Ocean Ridge's waiver argument thus fails to give sufficient effect to the trial court's prior denial of a dismissal in deference to the chapter 120 proceedings.
Turning to the merits of the defense, we conclude in summary that DNR had primary jurisdiction of the entire subject in suit. The statutory provisions quoted above plainly lodge the sole and exclusive power in DNR to regulate and control the operation of the Inlet and the sand transfer plant. If the operation of that plant is no longer desirable  if, indeed, the operation has a "significant adverse impact on the sandy beaches" near the Boynton Inlet  then DNR has the power and responsibility to resolve the contested facts in an ordinary proceeding under section 120.57 and, using its special expertise, decide on any cure. The role of the judiciary is quite limited here, restricted under section 120.68 to review of the agency's final order.
Ocean Ridge has dressed up its agency enforcement claims as common law or equity actions seeking relief from a public nuisance; *87 it attempts thereby to avoid the primary jurisdiction of DNR.[9] We construe each of the separate counts in Ocean Ridge's pleading that went to trial, however, to state a single grievance. It is that the design and operation of the sand transfer plant as permitted by DNR have deprived Ocean Ridge's beaches of sand that the ebbs and flows of the ocean would have otherwise deposited there. Moreover, all of its claims seek a single remedy: that its beaches be renourished and replenished to the condition that would of obtained if the plant had been operated in the manner it conceives as proper.
Because the plant is operated under DNR's regulation and the lawful permit issued under that authority, the operation in compliance with the permit conditions simply cannot, without more that is lacking here, be deemed a public nuisance. We contrast the present circumstances with those in Cowan v. People ex rel. Florida Dental Ass'n, 463 So.2d 285 (Fla. 4th DCA 1985), and State ex rel. Gardner v. Sailboat Key Inc., 295 So.2d 658 (Fla. 3d DCA), cert. denied, 304 So.2d 453 (Fla.), cert denied, 308 So.2d 111 (Fla. 1974). In Cowan the petitioners were being accused of operating an illegal "kickback" scheme in the practice of dentistry, which was alleged to constitute a public nuisance. Gardner involved the contention that the exhaustion of administrative remedies, i.e. the application of all pertinent planning and zoning requirements to the proposed development, would itself result in a public nuisance.
Neither situation or contention is present here. No one contends that this plant is operating in an illegal manner, i.e., contrary to statutes or the licensing authority's duly adopted rules. Nor does anyone contend that any future modification or enforcement proceeding conducted by DNR would itself result in a condition that would inevitably constitute or continue a public nuisance. Rather, the essence of Ocean Ridge's complaints is that the normal, authorized and expected operation of the sand transfer plant alone makes it a public nuisance.
To agree with the city's contention would require the court to conclude that it is the very exercise of agency expertise and discretion that has made the nuisance possible. In short, the court would have to substitute its judgment for the agency's. If so, the legislative attempt to give the agency the sole power to decide how the plant should be run would be entirely ineffectual. The agency's exercise of judgment would always be subject to the judiciary's power to overrule it by the simple legal conclusion that the agency judgment results in a public nuisance. Administrative control would ultimately be subject to the courts, who would effectually make the policy decisions that are supposed to have been left to the agency.
We recognize that the question whether a controversy involving an administrative agency lies in the courts or, instead, within the agency itself in a proceeding under section 120.57 is one of policy and not subject matter jurisdiction. Gulf Pines Memorial Park Inc. v. Oaklawn Memorial Park Inc., 361 So.2d 695 (Fla. 1978). The applicable policy has been stated, moreover, with unmistakable clarity by the supreme court in Gulf Pines: "if administrative agencies are to function and endure as viable institutions, courts must refrain from `promiscuous intervention' in agency affairs `except for most urgent reasons.'" 361 So.2d at 698. The court cited a leading case on the subject stating:
"The companion doctrines of primary jurisdiction and exhaustion of remedies are not statutory creatures but judicial, together constituting `a doctrine of self limitation which the courts have evolved, in marking out the boundary lines between areas of *88 administrative and judicial action.' * * * The one counsels judicial abstention when claims otherwise cognizable in the courts have been placed within the special competence of an administrative body; the other, when available administrative remedies would serve as well as judicial ones. Even though the legislature may not presume to characterize an adequate administrative remedy as `exclusive,' courts will so regard it."
State ex rel. Dep't of General Serv. v. Willis, 344 So.2d 580, 589 (Fla. 1st DCA 1977). Judge Smith, the author of Willis, went on to explain:
"The [Administrative Procedures] Act's impressive arsenal of varied and abundant remedies for administrative error requires freshening of the doctrines of primary jurisdiction and exhaustion of remedies, and greater judicial deference to the legislative scheme. It is not that the power of circuit courts has been lessened, nor that their historic writs have been surrendered. Rather, the occasions for their intervention have lessened."
344 So.2d at 590. Hence, the court in Gulf Pines held:
"as a general proposition, the circuit court should refrain from entertaining declaratory suits except in the most extraordinary cases, where the party seeking to bypass usual administrative channels can demonstrate that no adequate remedy remains available under Chapter 120."
Gulf Pines, 361 So.2d at 699. Later, in Key Haven Associated Enterprises Inc. v. Board of Trustees of the Internal Improvement Trust Fund, 427 So.2d 153 (Fla. 1982), the court added:
"Judicial intervention in the decision-making function of the executive branch must be restrained in order to support the integrity of the administrative process and to allow the executive branch to carry out its responsibilities as a co-equal branch of government."
427 So.2d at 157.
The application of this strong policy of judicial deference to the agency is illustrated by Willis:
"Does the complaint * * * demonstrate some compelling reason why the Administrative Procedure Act does not avail them in their grievance against the Department, and why the circuit court must therefore intervene? We think it does not. No lack of general authority in the Department is suggested; nor is it shown, if that is the case, that the Act has no remedy for it. No illegal conduct by the Department is shown; nor, if that is the case, that the Act cannot remedy the illegality. No departmental ignorance of the law, the facts or the public good is shown; nor, if any of that is the case, that the Act provides no remedy for it. No claim is made that the Department ignores or refuses to recognize relators' substantial interests, or refuses to afford a hearing, or otherwise refuses to recognize that relators' grievance is cognizable administratively. The respondent * * * [has] made no showing that remedies available under the Act are inadequate."
344 So.2d at 591.
We could transfer the inquiries used in Willis to this dispute and respond with identical answers. There is no serious contention here that the APA does not appertain. No reason at all is suggested for circuit court intervention; e.g., that agency errors have been so egregious or devastating that administrative remedies would be too little, too late. The authority of DNR is conceded by Ocean Ridge's own resort to it in the stipulation dropping DNR as a party. There is no contention that DNR has acted illegally or cannot cure past illegal conduct. There is not a jot of evidence to suppose that DNR is insensitive to the facts, law or public interests in beach and shore preservation. Nor does the record show a perverse attitude by DNR to deny even a hearing to Ocean Ridge and those aligned with it. In short, the application of the Willis analysis yields the same result in this case.
We interpret this clear policy of judicial restraint to prohibit circuit court assumption of this lawsuit. An agency's primary jurisdiction cannot be transferred, in effect, to the judicial forum as an action for declaratory or equitable relief simply by artful pleading of *89 public nuisance claims. Nor does the fact that the beaches of Ocean Ridge do not receive enough sand through the operation of a DNR licensed and permitted sand transfer plant make the plant operation a nuisance. It merely means that a person with a substantial interest in the operation of the plant, like Ocean Ridge or Manalapan, has the right to petition DNR for changes in the agency regulated operation. It most surely does not create a breach in the wall of DNR's primary jurisdiction through which the judiciary should insinuate itself by an action to abate a nuisance.
Even if it could be said that, in effect, all parties to both proceedings simply got together and agreed that the court, not the agency, should decide the dispute, we would have considerable trouble in accepting that agreement. Just as it is widely recognized that parties may not confer jurisdiction on a court where it is lacking, we do not believe that the parties  even with the connivance of the agency  could by agreement oust an executive branch agency of lawful duties reposed there by the legislature. This is especially true when their agreement follows an erroneous decision by a trial court refusing to recognize the primary jurisdiction of the agency.
Ocean Ridge places substantial reliance on the PLQ provision adopted in 1986 and repealed in 1987. But there is nothing in the statutory text  either before or after the repealer  that expressly states a purpose to create private or local government rights to any measurable quantity of sand on state sovereignty beaches and lands which courts should enforce. The deleted text contained a general statement of an intent to create in the future some unspecified state projects for beach nourishment and restoration and erosion control, but the projects chosen would be selected by the Governor and Cabinet as head of DNR.[10] At best, this deleted text stated a then present intention for possible future legislative action by the state, but failed to express or even hint at an intention that the courts should decide as to how the beaches within their respective jurisdictions would be restored.[11]
Nor could the 1987 deletion of the 1986 addition even remotely be deemed to state such a policy. Apart from the obvious fact that it was a deletion, and not an addition, to the statutory text, there is absolutely nothing in chapter 87-97 to suggest that DNR was thereby stripped of its authority over sandy beaches and inlet sand transfer plants. Moreover, when the legislature effected the 1987 changes, it left untouched the clear provisions of section 161.061(1). That section provides that:
"[a]ny coastal * * * jetties * * * regardless of date of construction or whether a permit has been issued in accordance with *90 part I of this chapter * * * which proves to be undesirable * * * as determined by [DNR], shall be adjusted, altered, or removed * * * after written notice by the Division. * * * The decision of [DNR] as to whether to adjust, alter, or remove such coastal construction * * * shall be final and [DNR] shall set a reasonable time within which the adjustment, alteration, or removal shall be accomplished." [e.s.]
§ 161.061(1), Fla. Stat. (1987). This provision clearly empowers DNR to decide whether the operation or design of the Boynton Inlet sand transfer plant should be altered or adjusted to reflect changes in circumstances since it was permitted. We also note that section 161.161 required a division of DNR to develop and maintain comprehensive plans for the maintenance and restoration of the state's eroding beaches. We repeat: both of these provisions were unaffected by the 1987 revision.
DNR has been charged by the legislature with sole responsibility for studying, controlling and remedying coastal inlet erosion. It controls and regulates sand transfer facilities already operating under permits from DNR. It is its duty to decide whether any such permit should be modified or withdrawn, whether some programs should be changed or shut down, whether some facilities should be moved, enlarged or limited, and whether some new programs should be started. If the downdrift beaches at any inlet within its jurisdiction are being slighted, it has been given the duty and the power to determine the correction and, under its permitting authority, to direct those responsible for operation to make the change. Its jurisdiction includes all sovereignty lands, such as those at this Inlet and along the beaches to the north and south.
When the legislature decides in an enactment to infuse an executive department with primary jurisdiction to regulate a specific subject, that represents a decision by our lawmakers that special expertise is required to resolve questions embraced by the subject, which the courts are ill-suited to decide. It would effectively nullify our lawmakers' policy decision if the agency and parties could simply reject the statutorily imposed responsibility and instead have the courts make the determinations that have been given exclusively to the executive to make.
Moreover the subject of the statutory power may involve the interests of parties far beyond the ken of an ordinary lawsuit. That is surely true of competing interests in the offshore littoral sand transport along the east coast of Florida, which may reasonably involve substantial interests far away from the Boynton Inlet and the cities immediately north and south of it. It is exceedingly doubtful that judges in Palm Beach County have the resources to exercise the special expertise necessary to considering all of the various interests affected by decisions touching the flow of sand along Florida's east coast. We can readily foresee an irrational patchwork of inconsistent judicial determinations along the Atlantic coast of Florida if judges, rather than DNR, should assume jurisdiction of these disputes.
The authority given by chapter 161 to DNR is not written in the sand. The agency is not free to wash it away with the movement of the tides. It is merely about sand. The power to regulate sand transfer plants at coastal inlets is not a castle constructed in sand that the agency can abandon when it finds the duty factually complex or technically daunting, or because it finds the competing claims of parties in interest too contentious. The operation of the sand transfer plant was studied and permitted by DNR's predecessor in 1965. If time and the tides have eroded the felicity of the 1965 permit conditions and requirements, then the law and the permit both provide non-judicial means for any correction.[12]
*91 The permit itself contained an express agreement by the state, District and County that  if the appropriate agency [now DNR] so concluded  the District would "adjust, alter or remove" any structure, work or activity that damages surrounding property or proves undesirable. Under section 161.041(1), DNR is now charged not to issue any permit for the maintenance of a coastal inlet jetty that has a significant adverse impact on the sandy beaches in this state. Ocean Ridge's suit was nothing if not a complaint that the operation of the plant had damaged its beaches by excessive erosion and had become undesirable.
Even according due weight to the familiar proposition that an administrative agency's determination as to the scope of its responsibility is entitled to considerable deference, we draw a distinction between good faith differences as to how far it may reach in a given dispute, and the utter abdication of responsibility. DNR alone has been given the duty to decide whether Ocean Ridge or Manalapan have lost too much sand in the shifting tides, offshore flows and the plant transfers. It alone must decide on any necessary remedy. It alone has the expertise to do so. The judiciary does not.
We reverse and remand with instructions to vacate the amended final judgment and direct the court to require the parties to litigate their claims and positions in an ordinary chapter 120 proceeding to determine substantial interests.
REVERSED AND REMANDED WITH DIRECTIONS.
GLICKSTEIN and PARIENTE, JJ., concur.
NOTES
[1] The Inlet is variously called the South Lake Worth Inlet and the Boynton Inlet. Both names refer to the same man-made coastal intrusion.
[2] This 1915 legislation also includes a provision granting a private right of relief "in law or in equity" to property owners who suffer "any damage or injury occasioned or occurring to private property by washing, overflowing of lands from other cause, resulting from constructing of such inlet or the opening thereof * * *." [e.s.] Plaintiffs in this action argue that this text created a private right to relief of the kind awarded by the trial judge, i.e., a right to operate the sand transfer plant to deposit a certain quantity of sand annually on the beaches of Ocean Ridge. Reading this language as a whole, however, we conclude that it created a right to relief only for private property owners, as opposed to public entities like this city, and only when such privately owned land was damaged by water unleashed or set in motion by the act of constructing the inlet or opening it. We are unable to find any rights within its terms as to the normal or consequential acts or processes of erosion that arise merely from maintaining the Inlet.
[3] In 1965 the designated state agency was the Trustees of the Internal Improvement Fund [TIIF]. In 1969 the legislature created DNR and shifted all responsibility and authority for shore and beach preservation from TIIF to DNR. See Ch. 69-106, § 25, Laws of Fla.
[4] The permit cites that it was issued by TIIF pursuant to sections 161.05 and 161.06, Florida Statutes.
[5] Meanwhile, in 1967 County had entered into a 50 year lease with District to operate the sand transfer plant. The lease requires County to operate the facility in accordance with the terms and conditions specified by the 1965 state permit. In 1983, however, County subcontracted day-to-day operation of the plant back to the District. The return of operations to the District was subject to a proviso that County retained ultimate responsibility for compliance with the 1965 permit conditions.
[6] See § 120.69(1)(b), Fla. Stat. (1991).
[7] In so doing, the court rejected all affirmative defenses, including the primacy of DNR's jurisdiction, as well as laches.
[8] As we observed before, when DNR was dropped by Ocean Ridge after the first week of trial had ended, the defendants immediately objected to that dropping by seeking an order requiring DNR to remain a formal party. We do not regard as significant the fact that their objection does not restate the administrative law defenses.
[9] The Florida Administrative Procedures Act, section 120.50-120.73, Florida Statutes (1993), contains a "savings to suitors" provision, which provides:

"120.73 Circuit court proceedings; declaratory judgments. 
Nothing in this chapter shall be construed to repeal any provision of the Florida Statutes which grants the right to a proceeding in the circuit court in lieu of an administrative hearing or to divest the circuit courts of jurisdiction to render declaratory judgments under the provisions of chapter 86."
Even if Ocean Ridge's pleading based judicial jurisdiction on chapters 86 and 823, we would not find either statute or both together a sufficient basis to avoid the agency's primary jurisdiction, as our reasoning hereafter makes clear.
[10] In the Preamble to Chapter 86-138, the legislature stated:

"WHEREAS, the Governor and Cabinet as head of [DNR] recognize that beach restoration and renourishment should be further pursued as a state initiative in recognition that, for highly developed urban and resort areas where existing buildings are often poorly sited or designed, the failure to restore such beaches may result in extensive coastal armoring and the subsequent loss of state's sandy beaches, and
WHEREAS, the Governor and Cabinet recognize that the restoration of selected critically eroding beaches would be in the state's best interest but further recognize that such restoration should not be justification for continuation of imprudent coastal development practices * * *."
Ch. 86-138, Laws of Fla.
[11] For the benefit of the aficionados of legislative history, the legislative committee reports state that the excised text was removed from the statute to do away with the requirement for annual placement of sand dredgings on public beaches. Another legislative committee report adds that the language was removed to make the statute consistent with other provisions authorizing DNR to pay up to 75% of the costs of approved inlet sand transfer projects. This legislative history suggests that the abandoned text merely required an annual placement of sand on downdrift beaches at navigation inlets and that the State would pay for 75% of the sand so transferred. To the extent that these committee reports state a conclusion different from the text actually adopted and enacted into law, they cannot and should not be taken seriously. See Coleman v. Coleman, 629 So.2d 103 (Fla. 1993) (in construing clear statute that is not unreasonable or illogical court may not go outside statutory text to give it different meaning); Aetna Casualty & Surety Co. v. Huntington Nat'l Bank, 609 So.2d 1315 (Fla. 1992) (same).
[12] The magnitude of the remedy ordered by the circuit judge in this case establishes that he deemed the operation of the plant to be a public nuisance for a period that can only be measured in decades. Were we to address the merits of his decision, we would find prejudicial error in his rejection of the laches defense. As applied to this case, laches would mean to us that any remedy from a court could reach back only so far as would not be barred by laches, i.e. within a 4-year period. We can find nothing in the evidence to support a conclusion that 1.5 million cubic yards of sand were lost improperly because of the operation of the sand transfer plant within the 4 years preceding the filing of this action.